## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RONALD GARDNER, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, DELTA AIR LINES, INC., and DOES 1–10, <br><br> Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE AN EXPERT WITNESS <br><br> Case No. 1:14-cv-00125-JNP-DBP <br><br> District Judge Jill N. Parrish |

Ronald Gardner sued Delta Airlines and the United States of America based upon his interactions with an air marshal. He asserted a number of claims, including intentional and negligent infliction of emotional distress, negligence, false imprisonment, and assault. Before the court are motions for summary judgment filed by Delta and the United States and a motion to exclude an expert witness filed by Gardner. The court GRANTS Delta's motion for summary judgment and GRANTS IN PART AND DENIES IN PART the United States' motion for summary judgment. The court DENIES without prejudice Gardner's motion to exclude an expert witness.

## BACKGROUND[1]

Gardner has macular degeneration, which eliminates his central field of vision and renders him legally blind. In 2011, he had some peripheral vision, which he could use to perceive the shape of a face and determine when a person is facing him. He could also see the color of

---

[1] The court recites the facts of the case in the light most favorable to Gardner's claims.

clothing a person was wearing and perceive an individual's "gross movements," like standing up, sitting down, or walking. Gardner is also hearing impaired and wears hearing aids. It is difficult for him to engage in conversation with someone behind him on an airline flight due to the ambient noise. On the date of the incident that is the basis of this lawsuit, Gardner was 59 years old.

On January 20, 2011, Gardner was seated in the first class section of a Delta flight from Washington, D.C. to Salt Lake City. Two undercover federal air marshals (FAM1 and FAM2) were also aboard the flight. FAM1 was seated directly behind Gardner. FAM2 was seated in the row behind FAM1 on the other side of the aisle. FAM1 is 6 foot 2 inches tall, weighs 235 pounds, and is an active weightlifter.

After take-off, Gardner began to slowly recline his seat. He felt a violent hit on the back of his seat that shoved it back into an upright position. Five to ten minutes later, Gardner began to recline his seat a second time. His seat was hit from behind even more violently, causing it to return to an upright position and causing Gardner to jolt forward in his seat. Gardner turned his head over his left shoulder and said, "Hey, fella, we each have a ticket on this flight." FAM1 responded in a "disgusted tone," but Gardner could only make out the word "computer" in his response.[2] A few minutes later, Gardner tried to recline his seat for a third time, but FAM1 again pushed the seat forward. Gardner's further attempts to recline the seat were futile because FAM1 was applying pressure to the back of the seat.

Gardner went to the galley at the front of the airplane where the head flight attendant was located. The flight attendant noticed that Gardner was "literally shaking," sweating, and taking

---

[2] FAM1 admitted to the head flight attendant that he told Gardner that if he reclined his seat again, "We will settle this on the ground." Gardner apparently did not hear this ultimatum.

shallow breaths. Gardner told the head flight attendant what had occurred and asked for assistance. The attendant responded that he would take care of it. The flight attendant then looked at a paper posted on the wall, which Gardner presumed to be either a flight manifest or a list of passengers in first class, and mentioned to Gardner that it was odd that the man seated behind him did not have a frequent flier number. Gardner entered the bathroom to allow himself some time to calm down and to give the flight attendant time to deal with the situation.

While Gardner was in the bathroom, the head flight attendant spoke with FAM1. FAM1 complained that if Gardner reclined his seat, he would not have enough room to use his laptop. Given FAM1's level of agitation during this discussion and the fact that he was armed, the flight attendant became instantly concerned for the welfare of Gardner and all of the other passengers on the flight. The flight attendant told FAM1 that he would ask Gardner to consider reclining his seat to a lesser degree, but that under no circumstances should FAM1 physically or verbally threaten Gardner. The Head flight attendant then returned to the galley at the front of the airplane.

After Gardner had waited in the bathroom for a couple of minutes, he returned to his seat. As he was sitting down, FAM1 stood up and angrily said, "I was just looking for a little compromise." Gardner responded, "Compromise is fine, bullying is not." FAM1 left his seat and went to the front of the airplane for one or two minutes and then returned.[3] As FAM1 was sitting

---

[3] Unbeknownst to Gardner, FAM1 went to the front of the airplane to confront the head flight attendant. In an "angry" and "intimidating" manner, FAM1 accused the attendant of taking Gardner's side in the dispute. Before returning to his seat, FAM1 told the attendant, "You and I will settle this on the ground." The head flight attendant was inclined to take this threat seriously and considered notifying Salt Lake City police to meet the airplane at the ground. The attendant ultimately decided against involving the police, but stated that he had "never been closer to, or felt more justified in calling police."

down, he grabbed Gardner's seatback and "jostl[ed] the heck out of it." Gardner began to worry that the man seated behind him had found his name on the list posted near the front of the airplane.

After the flight attendants served drinks, the head flight attendant came to Gardner's seat, crouched down, and said to Gardner, "It's okay. He's in a pile of shit. It's the federal air marshal." Gardner believed that the head flight attendant was attempting to reassure him by letting him know that FAM1 would be dealt with. But the revelation that the man seated behind him was a federal air marshal had the opposite effect. Gardner then knew that FAM1 was armed. He also worried that FAM1 would be able to discover his name, address, future flight plans, and whether his wife was flying with him or would be home alone. For the rest of the flight, Gardner was so nervous and upset that the woman seated next to him asked if he was alright.

Near the end of the flight, the head flight attendant approached Gardner and said, "You know, I have flown with you a lot, and I know how independent you are and that you don't need help getting off of the plane, but I want to help you off the plane tonight." Gardner said that he appreciated the offer and accepted it. The attendant said that he had to do some things after the airplane landed. He told Gardner to wait in his seat until he came to get him and that after the first class section was empty, he would escort Gardner off the airplane and through the airport.

When the airplane landed, Gardner waited in his seat for about ten minutes after he believed that everyone in first class had deplaned. At that point, he could no longer hear passengers in coach exiting the airplane and he decided to leave. Unbeknownst to Gardner, FAM1 had waited on the airplane as well. As Gardner stood up and retrieved his briefcase and cane, FAM1 also stood up and moved to the aisle. When Gardner turned towards the exit, he found himself face to face with FAM1, who was blocking the aisle. Gardner, in shock, yelled

"What is he doing here?" Gardner heard the lead flight attendant respond from the front of the airplane, "Well, I guess he has as much right to get off the plane as anyone else." Gardner then asked whether the lead flight attendant was going to help him off the airplane. He responded that he had called someone from the airport to came and assist Gardner. Gardner than said to FAM1, "Excuse me, I've got to get my suitcase." FAM1 did not move or say anything in response. Gardner repeated his request to get by FAM1 multiple times, but for about three minutes FAM1 remained motionless and silent. At some point, a Delta airport employee arrived to assist Gardner. When FAM1 turned to look at the airport employee behind him, Gardner pushed passed FAM1. The airport employee retrieved Gardner's bag from the overhead bin and the two of them exited the airplane.

When they entered the airport, Gardner told the Delta airport employee that he wanted to hide to avoid any encounter with the man who was with him on the airplane. The airport employee led Gardner to a spot behind some type of divider or placard. Gardner then asked the airport employee to tell him when the captain walked by because he wanted to talk to him. When the Delta airport employee spotted the captain, the pair approached him. Gardner told the captain that he wanted to talk to him about what happened on the flight, and the captain responded that he had heard about it. At that point, Gardner realized that another man was standing next to the captain. Gardner asked the airport employee whether it was the man who was in first class, and he said yes. Gardner asked the captain to speak in private. The captained waived off FAM1, who moved a few feet away.

Gardner, the captain, and the Delta airport employee began to walk through the airport. In response to Gardner's questions of what he should do, the captain said that he should call customer care. When Gardner expressed dissatisfaction with this option, the captain responded at

least twice by saying "Aw, I think you'll be all right." Gardner again noticed that a man was next to the captain, and the airport employee confirmed that it was FAM1. The captain then excused himself and left.

Gardner and the Delta airport employee began to make their way to the airport exit, and FAM1 followed a few feet behind them. In response to Gardner's inquiries, the airport employee continually updated Gardner on where FAM1 was walking and what he was doing. He told Gardner that FAM1 was following them and that he was looking over at them. Gardner believed that FAM1 was intentionally stalking him. When Gardner, the Delta airport employee, and FAM1 approached the security check area, Gardner intentionally allowed FAM1 to go past security first. Gardner and the airport employee then sprinted as fast as Gardner could to a different exit so that he could lose FAM1. Gardner exited the airport without further incident.

Gardner sued both Delta and the United States based upon this incident. In his complaint, Gardner alleged that his encounter with FAM1 caused him to suffer from post-traumatic stress disorder; anxiety; depression; periodic, anxiety-related loss of the little remaining vision he has; panic attacks; fear of public places; insomnia; and recurring nightmares. Gardner voluntarily dismissed two of the causes of action he originally asserted, leaving claims against Delta for (1) negligence, (2) negligent infliction of emotional distress, (3) breach of duty of a common carrier towards a disabled passenger, (4) breach of duty towards a business visitor, and (5) a cause of action that Gardner labels as a respondeat superior claim. The parties dispute whether a sixth claim for intentional infliction of emotional distress survived Delta's motion to dismiss. Gardner also asserted claims against the United States for (1) negligence, (2) intentional infliction of emotional distress, (3) negligent infliction of emotional distress, (4) false

imprisonment, (5) assault, and (6) a cause of action that Gardner labels as a respondeat superior claim.

**APPLICABLE LAW AND LEGAL STANDARDS**

The parties have not engaged in a choice of law analysis to determine which state's substantive laws governs Gardner's various causes of action. But by citing Utah authorities, they appear to agree that Utah law controls. The court, therefore, applies Utah's substantive law to Gardner's state-law claims.

The court applies federal procedural law to determine whether summary judgment is appropriate. *See Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). On a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (citation omitted). However, "[w]hen the moving party has carried its burden under rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (citation omitted).

**ANALYSIS**

I.      **DELTA'S MOTION FOR SUMMARY JUDGMENT**

    A.  *Intentional Infliction of Emotional Distress*

The court must first determine whether Judge Kimball dismissed Gardner's intentional infliction of emotional distress claim against Delta. Delta argues that Judge Kimball dismissed this claim in his June 18, 2015 order; Gardner contends that he did not.

In his order on Delta's motion to dismiss, Judge Kimball concluded that the facts alleged in the complaint were sufficient to support a claim that the actions of Delta's employee's constituted intentional infliction of emotional distress. [Docket 30, p. 5]. But Judge Kimball further determined that Delta could not be held liable for this tort because "to the extent that Gardner can prove a claim of intentional infliction of emotional distress against a Delta employee, such conduct would be outside the scope of that employee's employment and Delta would not be liable under respondeat superior." [Docket 30, p. 6]. Thus, Judge Kimball clearly found that Delta prevailed as a matter of law on the intentional infliction of emotional distress claim and dismissed this cause of action. The intentional infliction of emotional distress claim against Delta is no longer a live issue in this case.

    B.  *Preemption*

Delta argues that Gardner's claim for negligent infliction of emotional distress and his negligence-based claims[4] are preempted by federal statutes governing airlines. Gardner asserts

---

[4] In addition to asserting a claim for negligence, Gardner also asserts separate causes of action that he labels as claims for respondeat superior, breach of duty of a common carrier towards a disabled passenger, and breach of duty towards a business visitor. There is no such thing as a respondeat superior cause of action. It is a legal doctrine that holds employers liable for the torts of employees. *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007)

that Delta waived its preemption argument. He also contends that his claims are not preempted. The court will address each of these issues in turn.

　　　　1)　Delta did not waive its preemption argument.

Gardner first argues that Delta waived its preemption argument because it did not assert it in the motion to dismiss. But it provides no authority for this proposition. The case Gardner cites states only that parties may not raise a new argument in a motion for reconsideration. *See Carvana v. MFG Fin., Inc.*, No. 2:07-CV-00128DAK, 2008 WL 2468539, at *2 (D. Utah June 17, 2008). Delta did not waive preemption by failing to raise it in the motion to dismiss.

Gardner also argues that Delta may not assert a preemption argument in its motion for summary judgment because it did not plead it as an affirmative defense. Gardner is correct that preemption is an affirmative defense that should be pleaded. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 634 (2011) ("Because pre-emption is an affirmative defense, a defendant seeking to set aside state law bears the burden to prove impossibility."); *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1092 (10th Cir. 2015) ("[P]otential preemption defenses, like most other affirmative defenses, are forfeited if not made."). Thus the question before the court is whether Delta may raise its unpleaded preemption affirmative defense for the first time in a motion for summary judgment.

---

("*Respondeat superior* is not itself a cause of action or a cognizable legal claim."); *Ellis v. Isoray Med., Inc.*, No. 08-2101-CM, 2008 WL 3915097, at *3 (D. Kan. Aug. 22, 2008) (same). And Gardner's breach of a duty of a common carrier and breach of a duty toward a business visitor claims are, at most, species of negligence that can be analyzed together with the negligence claim for the purposes of determining whether they are preempted. *See Hill v. Superior Prop. Mgmt. Servs., Inc.*, 321 P.3d 1054, 1060 (Utah 2013) (holding that premises liability is a "negligence-based theory."); *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 930 (Utah 1993) (analyzing a negligence claim and holding that "[c]ommon carriers are held to a higher standard of care than the 'reasonably prudent person' standard").

"[T]he substance of many unpleaded Rule 8(c) affirmative defenses may be asserted by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed. 2004); *accord Ahmad v. Furlong*, 435 F.3d 1196, 1204 (10th Cir. 2006) (permitting the defendants to raise an unpleaded affirmative defense in a motion for summary judgment because the plaintiff had not shown any prejudice); *cf. Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998) ("Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed.R.Civ.P. 15."). Gardner has had an opportunity to respond to the preemption argument. The issue that must be decided, therefore, is whether Gardner's has been prejudiced by Delta's failure to give notice of its preemption defense before the close of discovery.

The court determines that Gardner has not been prejudiced. As described in greater detail below, Delta's preemption defense turns on whether Gardner's common law tort claims are "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). This analysis requires the court to examine the relationship between the substance of Gardner's claims and airline prices, routes, and services. No additional discovery would affect the court's resolution of this question because it rests on a broad view of the nature of these claims rather than a detailed examination of the evidence supporting the claims. Therefore Gardner was not prejudiced by Delta's failure to give notice of its preemption defense prior to the close of discovery and the court permits Delta to raise preemption through its motion for summary judgment.

2) Gardner's claims against Delta are preempted.

The Federal Aviation Act of 1958 (FAA) authorized broad federal regulation of the airline industry, including the regulation of interstate airfares. Pub. L. No. 85-726, 72 Stat. 731 (1958). In 1978, Congress amended the FAA with the Airline Deregulation Act (ADA), which undid government regulation of ticket prices. "To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision . . . . *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). The ADA preemption provision prohibits any state from "enact[ing] or enforce[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).[5]

The U.S. Supreme Court analyzed this provision and held that the phrase "related to" expresses "a broad pre-emptive purpose." *Morales*, 504 U.S. at 383. Thus, "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted under" the ADA preemption provision. *Id.* at 384. The Court cautioned, however, that not every conceivable connection between a state law and airline rates, routes, or services is sufficient to merit preemption. "'[S]ome state actions may affect [airline prices, routes, or services] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* at 390 (citation omitted).

---

[5] In 1994, after the Supreme Court issued *Morales*, Congress renumbered and revised the FAA and the ADA and changed the wording of the preemption clause. Pub L. No. 103-272, 108 Stat. 745 (1994). Congress confirmed that the 1994 amendments were stylistic and did not substantively change the meaning of the provisions of the ADA. Pub L. No. 103-272, § 1(a), 108 Stat. 745; *see also Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1429 (2014) (". . . Congress made it clear that this recodification did not effect any 'substantive change.'"). The court cites the current version of the preemption provision, but pre-1994 interpretations of the provision are still binding authority.

The Supreme Court has applied this preemption test on three occasions. In *Morales*, a coalition of state attorney generals issued a number of guidelines regarding airfare advertising. *Id.* at 379. The guidelines purported to explain how state deceptive practices laws required airlines to disclose restrictions to an advertised fare. *Id.* at 387–88. The Court held that the guidelines "related to" airline prices because they explicitly bore "a 'reference to' airfares." *Id.* Moreover, since state deceptive practices laws would effectively give consumers a right to an advertised fare if an advertisement failed to adequately disclose restrictions on the fare, these state laws directly related to prices for air travel. *Id.* at 388. The Court, therefore, found that the state-law based guidelines issued by the attorney generals were preempted.

In *American Airlines, Inc. v. Wolens*, the Court examined a class action law suit against an airline based on both the Illinois Consumer Fraud and Deceptive Practices Act and common-law breach of contract. 513 U.S. 219, 225 (1995). The plaintiffs alleged that an airline violated state deceptive practices law and state contract law when it devalued its frequent flier miles. *Id.* at 224–25. The Court held that the deceptive practices cause of action related to airline prices and services because this claim sought to establish the number of frequent flier miles required for free tickets and class-of-service upgrades. *Id.* at 226–28. The state deceptive practices claim was, therefore, preempted. The contract claim likewise related to airline prices and services because it sought the same relief as the deceptive practices claim. *Id.* at 226. But the court held that the contract claim was not preempted because this claim did not seek to enforce "state-imposed obligations," but rather the airline's self-imposed contractual undertakings. *Id.* at 228–29.

Finally, in *Northwest, Inc. v. Ginsberg*, the Court had to decide whether a claim for breach of the implied covenant of good faith and fair dealing was preempted. 134 S. Ct. 1422,

1426 (2014). In that case, an airline kicked the plaintiff out of its frequent flier program for alleged abuses, and he sued for readmittance. *Id.* The Court held that the ADA preemption clause applies to common-law claims like breach of the covenant of good faith and fair dealing because they are state-imposed obligations and not voluntarily assumed contractual duties. *Id*. at 1430. And because the suit sought readmittance to a frequent flier program, which allowed customers to earn free flights and class-of-service upgrades, the plaintiff's claim related to the airline's prices and services. *Id.* at 1430–31. Therefore the plaintiff's common-law claim was preempted. *Id.* at 1433.

The Tenth Circuit has also considered whether a tort claim was preempted by the ADA. In *Cleveland ex rel. Cleveland v. Piper Aircraft Corp.*, the pilot of a two-seat airplane was severely injured when he crashed into a van parked on the runway during takeoff. 985 F.2d 1438, 1441 (10th Cir. 1993).[6] The pilot's estate sued the airplane's manufacturer under a theory of negligent design. *Cleveland* held that even the broad reading of the ADA preemption clause announced in *Morales* would not lead to preemption of a tort claim for negligent design of an airplane. *Id.* at 1443–44 nn.11 & 13 ("We agree with the parties in this case that even a broad reading of the phrase, 'relates to,' would not encompass the safety regulations at issue here.").

Courts in other circuits agree that the ADA preemption clause does not grant blanket immunity to all tort claims. The Fifth Circuit, for example, interpreted the ADA's preemption provision in conjunction with a provision of the FAA requiring air carriers to obtain insurance for "bodily injury to, or death of, an individual or for loss of, or damage to, property of others,

---

[6] Some of the reasoning of *Cleveland* regarding implied preemption was later rejected by the Supreme Court. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010). But the subsequent Supreme Court opinion did not affect *Cleveland*'s reasoning regarding the ADA's express preemption clause.

resulting from the operation or maintenance of [an] aircraft." 49 U.S.C. § 41112(a); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 338 (5th Cir. 1995) (en banc). Reasoning that it would make no sense to require air carriers to obtain insurance for bodily injury and property damage if they were immune to all tort liability, that circuit held that "federal preemption of state laws, even certain common law actions "related to services" of an air carrier, does not displace state tort actions for personal physical injuries or property damage caused by the operation and maintenance of aircraft." *Hodges*, 44 F.3d at 336, 338.

Taken together, the above-mentioned cases suggest that some common-law claims, such as a claim for readmittance to a frequent flier program under a breach of the implied covenant of good faith and fair dealing theory, are preempted. Other claims, like negligent design of an aircraft leading to serious bodily injuries, are not preempted. The test for determining whether a particular claim is preempted is whether it is "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

In this case, Gardner's claims against Delta rest on three separate theories. First, Gardner argues that the head flight attendant negligently told him that FAM1 was an air marshal, which caused him stress and anxiety. Second, he asserts that the head flight attendant failed to promptly escort him off the airplane after inducing him to wait in his seat and failed to intervene when FAM1 blocked the aisle. Third, he contends that Delta employees failed to prevent FAM1 from following him through the airport. Delta argues that all of these theories of liability are related to a Delta service.

The Tenth Circuit has interpreted the term "service of an air carrier" broadly: "Elements of the air carrier service . . . include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself." *Arapahoe Cty.*

14

*Pub. Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1222 (10th Cir. 2001) (quoting *Hodges*, 44 F.3d at 336); *see also Am. Airlines,* 513 U.S. at 226 (holding that class-of-service upgrades related to airline services). If providing in-flight beverages is a "service," this expansive definition necessarily includes the mediation of disputes between passengers and maintaining order in the cabin to provide a safe and tranquil flight.

Under this definition of "service," Gardner's claims against Delta have "a connection with or reference to" a Delta service. *See Morales*, 504 U.S. at 384. The head flight attendant informed Gardner that FAM1 was an air marshal within the context of mediating a dispute between the two passengers. Indeed, Gardner concedes that the flight attendant was attempting to reassure him by letting him know that FAM1 would be dealt with. In addition, Gardner's claims that Delta employees did not do enough to protect him from FAM1 while he was exiting the airplane and travelling through the airport all related to Delta services. In essence, Gardner alleges that Delta did not provide the level or type of services that he needed to deal with FAM1. Thus all of Gardner's claims directly relate to a Delta service.

Other courts that have examined similar claims have concluded that they were preempted. *See Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 454 (1st Cir. 2014) (holding that claims for negligent and intentional infliction of emotional distress and for negligence were preempted where a package delivery company accidentally delivered a package containing marijuana to the plaintiff and the company revealed the plaintiff's address to the intended recipient of the package); *Xiaoyun Lucy Lu v. AirTran Airways, Inc.*, 631 F. App'x 657, 660–62 (11th Cir. 2015) (holding that tort claims were preempted where flight attendants exhibited rude behavior and removed the plaintiff from a flight, causing emotional distress); *Sawyer v. Sw. Airlines Co.*, No. CIV.A. 01-2385-KHV, 2004 WL 48899, at *6 (D. Kan. Jan. 7, 2004) (concluding that a

negligence claim was preempted where a passenger experienced emotional distress caused by a flight attendant's use of an historically racist nursery rhyme ("eenie, meenie, minie, moe, pick a seat, we gotta go") during boarding); *Joseph v. JetBlue Airways Corp.*, No. 5:11-CV-1387 TJM/ATB, 2012 WL 1204070, at *8 (N.D.N.Y. Apr. 11, 2012) (concluding that claims for infliction of emotional distress were preempted where an air carrier ran out of food and water and failed to control unruly passengers during a lengthy delay on the tarmac); *Howard v. Nw. Airlines, Inc.*, 793 F. Supp. 129, 132 (S.D. Tex. 1992) (holding that a plaintiff's claim based upon an airline's failure to meet a sick, elderly passenger and help him make a connecting flight was preempted).

The court, therefore, concludes that Gardner's negligent infliction of emotional distress claim and his negligence-based claims are explicitly preempted by 49 U.S.C. § 41713(b)(1). The court grants summary judgment in favor of Delta on all remaining claims against it.

## II.     THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

### A.  *Negligent Infliction of Emotional Distress*

Utah has adopted the Restatement (Second) of Torts test for negligent infliction of emotional distress. *Johnson v. Rogers*, 763 P.2d 771, 785 (Utah 1988). The second restatement provides: "If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor (a) should have realized that his conduct involved an unreasonable risk of causing the distress . . . and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm." RESTATEMENT (SECOND) OF TORTS § 313(1) (1965). This test is based upon the defendant's knowledge. Thus, the defendant "does not take the risk of any exceptional physical

sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it." *Id.* § 313 cmt. c.

Gardner asserts two distinct types of claims for negligent infliction of emotional distress. First, he alleges that FAM1's negligence directly caused him to suffer emotional distress. Second he contends that the negligence of unnamed individuals who trained or supervised FAM1 indirectly caused his emotional distress.

### 1) Direct Liability Theory

The United States argues that it is entitled to summary judgment on Gardner's direct negligent infliction of emotional distress claim based upon the actions of FAM1 because no reasonable jury could find that Gardner has satisfied both subdivision (a) and subdivision (b) of the Second Restatement test.[7] The evidence, taken in the light most favorable to Gardner's

---

[7] The United States cites language from both *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993) and *Harnicher v. University of Utah Medical Center*, 962 P.2d 67, 68 (Utah 1998) in support of its contention. In *Hansen*, Justice Durham suggested that a plaintiff could prevail on a negligent infliction of emotional distress claim in the absence of bodily harm if the defendant's actions caused a mental illness. *Hansen*, 858 P.2d at 975. Justice Durham opined that the mental distress must be severe to be deemed a mental illness: "We emphasize, however, that the emotional distress suffered must be severe; it must be such that 'a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Id.* (citation omitted) (alteration in original). But the remaining justices held that there was no reason to adopt the mental illness exception to the bodily injury requirement because the plaintiffs in that case did not claim that they had suffered from a mental illness. *Id.* at 982–83 (Zimmerman, J. concurring in the result). In *Harnicher*, Justices Howe and Zimmerman opined that even if the Utah Supreme Court were to adopt the mental illness exception, the plaintiffs in that case could not satisfy the elevated standard laid out in Justice Durham's opinion in *Hansen*. 962 P.2d at 71–72. The other three justices, however, did not join this opinion.

The United States' reliance on the language from Justice Durham's opinion in *Hansen* and Justice Howe's opinion in *Harnicher* is misplaced for two reasons. First, the language quoted from these cases is not binding authority because it was never adopted by a majority of the Utah Supreme Court. Second, even if the language were binding authority, it refers to the heightened standard for proving a mental illness. This language has no application to this case because

claims, shows that when Gardner attempted to recline his seat on three separate occasions, FAM1 violently shoved it forward. Later, FAM1 shook Gardner's seat as he was sitting down in order to physically intimidate him. FAM1 concedes that he discovered that Gardner was blind before the airplane landed. And given that the head flight attendant and the passenger seated next to Gardner perceived that he was deeply shaken by FAM1's actions, a fact finder could conclude that FAM1 also knew that he had frightened Gardner to the point that he was shaking, sweating, and taking shallow breaths. Despite this knowledge, he waited with Gardner until the first class section had emptied. When Gardner attempted to exit the airplane, FAM1 intentionally blocked him by standing in the aisle for three minutes. During this time, FAM1 ignored Gardner's frantic requests that he move so that Gardner could get by. FAM1 then stalked Gardner through the airport in order to further intimidate him.

Taking these facts together, a reasonable factfinder could conclude that FAM1 should have realized that his conduct involved an unreasonable risk of causing Gardner to experience emotional distress. Additionally, a factfinder could conclude that FAM1 should have realized that the distress might result in illness or bodily harm. The court, therefore, denies the United States' motion for summary judgment on Gardner's negligent infliction of emotional distress claim based upon FAM1's actions.

2) Indirect Liability Theories

Gardner's complaint alleges that unidentified individuals negligently inflicted emotional distress on him by breaching a "duty to train their employees and agents about how to properly treat airline passengers." Gardner does not clarify precisely who was at fault for failing to

Gardner does not claim that FAM1's actions caused him to suffer a mental illness. He alleges that he suffered a bodily harm that would satisfy the Second Restatement test.

properly train FAM1, how he was trained, or how he should have been trained differently. Absent this factual development, no reasonable factfinder could conclude that an unknown individual in charge of training FAM1 should have realized that his or her conduct involved an unreasonable risk of causing airline passengers to experience emotional distress. Nor could a reasonable factfinder determine that this unknown individual, from facts known to him or her, should have realized that the emotional distress might result in illness or bodily harm. Thus, the court grants summary judgment on Gardner's negligent training theory.

Gardner's complaint also alleges emotional distress caused by negligent supervision. In response to the United States' motion for summary judgment, Gardner clarifies that this claim is based upon the allegation that FAM2 failed to intervene and stop FAM1. But Gardner provides no evidence that FAM2 was FAM1's supervisor. Absent any evidence that FAM2 had a duty or the authority to supervise FAM1, Gardner cannot prevail on a negligent supervision theory of negligent infliction of emotional distress. Thus the court summarily adjudicates this claim in favor of the United States.

### B. Intentional Infliction of Emotional Distress

In order to prevail on his intentional infliction of emotional distress claim, Gardner must prove that FAM1

> intentionally engaged in some conduct toward [Gardner], (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Oman v. Davis Sch. Dist.*, 194 P.3d 956, 969 (Utah 2008) (citation omitted). "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable,

unkind, or unfair." *Id.* (citation omitted). "[L]iability under the tort of intentional infliction of emotional distress . . . may be found only where the conduct complained of has been so extreme in degree as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* at 970 (second alteration in original) (citation omitted). "[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Cabaness v. Thomas*, 232 P.3d 486, 499 (Utah 2010) (citation omitted). "However, '[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'" *Id.* (alteration in original) (citation omitted).

The Utah Supreme Court has concluded as a matter of law that declining a marriage proposal, referring a victim of sexual abuse to an unlicensed counselor, denying a claim for insurance benefits where the issue of coverage was fairly debatable, and firing an employee for cause do not constitute outrageous or intolerable conduct. *Gygi v. Storch*, 503 P.2d 449, 449–50 (Utah 1972); *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 207 (Utah 2001); *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 536 (Utah 2002); *Oman*, 194 P.3d at 970. On the other hand, the issue of whether a defendant's conduct was sufficiently extreme or outrageous was a jury question in a case where co-workers shadowed a fellow employee and subjected her to months of threatening looks and remarks. *Retherford v. AT&T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 978 (Utah 1992). The Utah Supreme Court similarly declined to resolve as a matter of law the issue of whether a defendant's conduct was sufficiently outrageous in a case where a supervisor required an employee to work in unsafe conditions and

subjected him to an ongoing pattern of abusive and intimidating comments. *Cabaness*, 232 P.3d at 500–01.

In this case, the United States argues that the court should determine as a matter of law that FAM1's actions were not sufficiently outrageous to permit Gardner's intentional infliction of emotional distress claim to proceed to trial. As described in greater detail above, FAM1 physically intimidated Gardner on a flight by shoving and shaking his seat, intentionally blocked him from exiting the airplane for three minutes, and stalked him through the airport. FAM1's conduct is dissimilar to the conduct described in cases where the Utah Supreme Court decided that the defendant clearly did not offend accepted standards of decency. Unlike rejecting a marriage proposal or firing an employee for cause, reasonable people could differ as to whether FAM1's conduct was outrageous, intolerable, and offensive to generally accepted standards of decency and morality. The court, therefore, denies the United States' motion for summary judgment on the intentional infliction of emotional distress claim.

### C. Negligence

Gardner also argues that the United States should be held liable under a negligence theory for his emotional distress damages. Utah law, however, does not permit a claim for ordinary negligence that is based upon emotional injuries. *Reiser v. Lohner*, 641 P.2d 93, 100 (Utah 1982) ("It is well established in Utah that a cause of action for emotional distress may not be based upon mere negligence."); *Samms v. Eccles*, 358 P.2d 344, 346 (Utah 1961). If an individual negligently inflicts emotional harm, the proper claim to assert is a cause of action for negligent infliction of emotional distress. *Johnson v. Rogers*, 763 P.2d 771, 779, 785 (Utah 1988); *see also Dalley v. Utah Valley Reg'l Med. Ctr.*, 791 P.2d 193, 201 (Utah 1990) ("The difference in the two theories [negligence and negligent infliction of emotional distress] is that awards for pain and

suffering result when the emotional trauma arises from the physical injury and awards for negligently inflicted emotional distress arise when physical or mental illness results from the emotional trauma itself."). Because Gardner does not assert that FAM1's negligence directly caused physical harm, the court grants summary judgment in favor of the United States on Gardner's ordinary negligence claim.

### D. Respondeat Superior

Gardner also asserts a claim for what he calls respondeat superior. But "[*r*]*espondeat superior* is not itself a cause of action or a cognizable legal claim." *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007)); *accord Ellis v. Isoray Med., Inc.*, No. 08-2101-CM, 2008 WL 3915097, at *3 (D. Kan. Aug. 22, 2008). It is a legal doctrine that holds employers liable for the torts of employees. Thus the court grants summary judgment on Gardner's so-called respondeat superior claim.

### E. False Imprisonment

"False imprisonment is an act 'intending to confine the other . . . within boundaries fixed by the actor,' which 'results in such a confinement' while 'the other is conscious of the confinement or is harmed by it.'" *Tiede v. State*, 915 P.2d 500, 503 n.4 (Utah 1996) (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 35(1) (1965)). "To make the actor liable for false imprisonment, the other's confinement within the boundaries fixed by the actor must be complete." *Id*. § 36(1). "If the actor knows of an avenue of escape, he cannot intend to imprison the other . . . ." *Id*. § 36 cmt. a. But an individual is not required to take an avenue of escape if it is "offensive to a reasonable sense of decency or personal dignity." *Id.*

The United States argues that it cannot be liable for false imprisonment because Gardner had a reasonable avenue of escape that would not have been unduly offensive. It asserts that

Gardner could have just pushed past FAM1 at any time. But the facts, taken in the light most favorable to Gardner's claim, do not support the United States' argument. According to Gardner's testimony, he was able to squeeze past FAM1 only when he turned sideways to look at the Delta employee behind him. It was this action that created the avenue of escape. Gardner presented evidence that FAM1, who is 6 feet, 2 inches tall and weighs 235 pounds, effectively blocked the aisle of the airplane when he stood face to face with Gardner, leaving no reasonable avenue of escape. The court, therefore, denies the United States' motion for summary judgment on the false imprisonment claim.

### F. Assault

"An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1) (1965); *see also Tiede*, 915 P.2d at 503 n.3 (citing the Restatement (Second) of Torts to define assault). "An attempt to inflict a harmful or offensive contact or to cause an apprehension of such contact does not make the actor liable for an assault if the other does not become aware of the attempt before it is terminated." *Reynolds v. MacFarlane*, 322 P.3d 755, 758 (Utah Ct. App. 2014) (quoting RESTATEMENT (SECOND) OF TORTS § 22 (1965)). The United States argues that it cannot be liable for assault because Gardner did not perceive that FAM1 was about to shove or shake his seat before he actually did it. The United States asserts, therefore, that FAM1's actions never caused Gardner to experience apprehension of imminent harmful or offensive contact.

The court agrees that there is little evidence that Gardner ever apprehended imminent contact. Gardner's deposition testimony indicates that he did not see what FAM1 was doing

behind him before FAM1 shoved his seat. *See Reynolds*, 322 P.3d at 758 (affirming the dismissal of an assault claim because the plaintiff was not aware of the defendant's presence behind him until the defendant snatched a ten dollar bill from his hand). And although it is unclear whether Gardner saw FAM1 place his hand on his seatback as FAM1 was returning to his seat to sit down, the evidence indicates that Gardner did not anticipate that FAM1 would violently shake his seat. Gardner instead testified that FAM1 disguised his intent by acting if he was simply steadying himself as he moved to his seat to sit down.

A factfinder, however, may infer from the evidence that Gardner apprehended that FAM1 would shove his seat when Gardner attempted to lower it for a third time. After FAM1 shoved his seat forward for a second time, Gardner and FAM1 exchanged words over the incident. At that point, it was clear to Gardner that FAM1 was prepared to physically challenge any attempt to recline his seat. From this evidence, a factfinder could conclude that Gardner apprehended that his seat would be shoved forward when he attempted to recline his seat for a third time. The court, therefore, denies the United States' motion for summary judgment on Gardner's assault claim.

## III.     GARDNER'S MOTION TO EXCLUDE EXPERT TESTIMONY

Gardner moves to exclude the defendants' joint expert, Dr. Moulton, under Rule 702 of the Federal Rules of Civil Procedure. Specifically, Gardner asserts that Dr. Moulton's opinions are not "the product of reliable principles and methods" because he did not examine Gardner before expressing opinions about his emotional distress, because his opinion that Gardner is malingering is improper, and because he expressed opinions about sleep apnea that are outside the scope of his expertise. See FED. R. EVID. 702(c).

Because the court grants summary judgment on all of Gardner's claims against Delta, the remaining claims against the United States will be tried before the court in a bench trial. *See* 28 U.S.C. § 2402. "[T]he usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). Therefore, "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation." *Id.* at 780.

In this case, the court determines that the best course of action is to allow Dr. Moulton to give testimony at the bench trial. This will allow the court to better assess whether Dr. Moulton's opinions meet the Rule 702 standard. The court, therefore, denies Gardner's motion to exclude Dr. Moulton's testimony at this time. Gardner can reraise this issue at trial or move to strike his testimony after Dr. Moulton testifies.

## CONCLUSION

The court orders as follows:

(1) The court GRANTS Delta's motion for summary judgment. [Document 116].

(2) The court GRANTS IN PART AND DENIES IN PART the United States' motion for summary judgment. [Docket 119]. The court grants summary judgment on Gardner's negligence and respondeat superior claims. The court also grants summary judgment on the negligent infliction of emotional distress claim to the extent that it is based upon negligent training or supervision. The court denies summary judgment as to the remainder of Gardner's claims against the United States.

(3) The court DENIES without prejudice Gardner's motion to exclude expert testimony
at this time. [Docket 120]. Gardner may raise his objection at trial or reassert this
motion after the expert testifies.

The issues that remain for trial are Gardner's claims against the United States for (1)
negligent infliction of emotional distress based upon the negligence of FAM1 (2) intentional
infliction of emotional distress, (3) false imprisonment, and (4) assault.

Signed June 8, 2018.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge